IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PETER ZISHKA,

      Plaintiff,

      v.                               Case No. 2:24-cv-02312-HLT

WWEX FRANCHISE HOLDINGS,
LLC, et al.,

      Defendants.

## MEMORANDUM AND ORDER

This is an employment-discrimination case. Plaintiff Peter Zishka sues his former employer WWEX/Globaltranz Enterprises for sex, age, and disability discrimination, as well as retaliation. Zishka also alleges breach of implied contract. The claims arise out of his termination in 2023. Defendants contend he was terminated because he was among the lowest performers on the sales team in terms of generating new business. Zishka contends it was discrimination and retaliation based on sex, age, and disability primarily because of a text message in which a manager referred to him as "old man" after he requested time off for a colonoscopy and because of a change in the commission structure that Zishka claims was designed to penalize older employees.

Defendants move for summary judgment. Doc. 136. The Court grants the motion. Zishka has failed to come forward with evidence that establishes a prima facie case of discrimination or retaliation. And, even to the extent he could make a prima facie case, he has not come forward with evidence from which a reasonable jury could conclude that the otherwise legitimate grounds for his termination were a pretext for discrimination or retaliation. Zishka has also conceded his implied-contract claim. The Court therefore enters summary judgment in favor of Defendants on all claims.

## I.    BACKGROUND[1]

### A.    Defendants' Policies

WWEX has policies demonstrating a commitment to a workplace free of discrimination and retaliation. DSOF 1-5. WWEX also has a disability-accommodation policy. DSOF 6. The employee handbook requires employees to report any prohibited conduct to a supervisor or manager and provide specific details. DSOF 7-8. WWEX's Corrective Action policy states employees may be subject to disciplinary action if their performance or conduct is unsatisfactory, which can include termination without prior counseling or warning. DSOF 10.

WWEX's employee handbook also provides for performance improvement plans ("PIP") if an employee fails to meet job expectations. DSOF 11. PIPs are discretionary and are only used if the PIP will improve the deficiencies at issue. *Id.* Theresa Obinger, WWEX's HR business partner, testified that, in her experience, sales representatives did not get PIPs because their goals are different than those in operations positions. DSOF 12. Sales representatives were aware that their goal was account acquisition, new logo acquisition, and upsell/cross-sell results,[2] and not meeting those goals could cost someone their job. *Id.* (including response). Sales representatives had access to sales-tracking systems to track their activities. *Id.* Zishka was not aware of anyone on his sales team that was given a PIP. *Id.*

The employee handbook expressly states that it does not constitute an employment contract or agreement of any kind and that employees can be terminated at any time. DSOF 14. When he

---

[1]    The following facts are undisputed for purposes of summary judgment and are viewed in a light most favorable to the non-moving party. "DSOF" refers to the facts listed in Defendants' memorandum. Doc. 137. "PSOF" refers to the additional facts listed in Zishka's response. Doc. 145. The Court notes that the parties almost uniformly do not directly respond to the factual allegations set forth by the other side; instead, they respond with additional—and often repetitive—facts or arguments about the implications of those facts. This unnecessarily complicates resolution of summary-judgment motions and is not appropriate.

[2]    New logo acquisition is a term used by WWEX for procuring new customers. DSOF 13. Upselling or cross-selling refers to selling existing customers more services. *Id.*

received the employee handbook, Zishka attested that he was required to read and be familiar with the guidelines and that he understood his employment with WWEX was at-will and he could be terminated at any time. DSOF 15. Zishka also attested he understood the handbook was not an express or implied contract or guarantee of continued employment. *Id.*

### B. Zishka's Employment

Zishka worked in the trucking and logistics industry his entire career. PSOF 1. Zishka began working for WWEX in May 2017 after WWEX acquired his former employer, Logistics Planning Services, LLC ("LPS"). DSOF 16.[3] At LPS, Zishka worked with Ross Spanier, who eventually became Zishka's supervisor at LPS. DSOF 17. Spanier came to work at LPS after being recruited by his friend Justin Hall, whose family owned LPS. DSOF 18. While at LPS, Zishka and Spanier traveled together for sales and developed a "pretty strong, deep working relationship." DSOF 19. Zishka thought Spanier was helpful and supportive, and their work led to success at LPS. *Id.*

When WWEX acquired LPS, their work continued in similar roles, and Spanier initially continued as Zishka's supervisor and as a supervisor for the entire "Enterprise Sales" team. DSOF 20. Spanier was eventually promoted. DSOF 21. J.J. Lewis briefly became the supervisor for the Enterprise Sales team, before that position was taken over by Roger Jones. *Id.* Lewis and Jones both reported to Spanier in their time supervising the Enterprise Sales team. *Id.* Spanier was responsible for reviewing personnel decisions for the Enterprise Sales team. *Id.*

---

[3]  The parties' unopposed facts state both that WWEX acquired LPS in May 2017 and that Globaltranz Enterprises, LLC acquired LPS in May 2017. DSOF 16; PSOF 5. At some point, WWEX and Globaltranz merged. PSOF 7. Both WWEX and Globaltranz are named defendants. The Pretrial Order states that Defendants believe Globaltranz should be dismissed because WWEX was Zishka's employer at the time of his termination, and WWEX agrees to assume all liability for damages. Doc. 133 at 1 n.2. Zishka does not agree to dismissing Globaltranz because some of the alleged discriminatory conduct occurred while he was employed by both Globaltranz and WWEX because of their combination/merger. *Id.* The parties generally refer to the business as WWEX, and the Court does likewise with the intent that this also includes Globaltranz where applicable.

Because of their past relationship, Zishka and Spanier remained friendly, routinely gave each other updates on their personal lives, sent holiday and birthday well wishes, talked sports, and joked around with each other. DSOF 22. When Spanier and his family took a trip to Florida in January 2022, Spanier and his family stayed at Zishka's condo and used Zishka's vehicle. *Id.* Zishka said he hoped his "amigo" would enjoy the vacation. *Id.* When Zishka contracted COVID-19 in September 2020 and was hospitalized, Spanier was in contact with Zishka's family and arranged for deliveries of flowers and food. DSOF 23. Zishka believed Spanier was expressing true concern for him. *Id.*

Zishka suffered cognitive impairment and fatigue from his bout with COVID-19 that affected his job performance over the next two years. PSOF 6, 35. Zishka was regarded as disabled by WWEX because of a partial amputation of his left hand, his impairments from COVID-19, and because he was an older male undergoing colorectal cancer screening. PSOF 35.[4]

### C.    Commission Changes

In January 2020, WWEX implemented a revised commission plan that changed the structure of commission payments. DSOF 26 (including response).[5] The new plan increased the incentive for first-year business and lowered the commission on existing business that had been with the company over three years. *Id.* Jones testified that the purpose of paying higher commissions on new accounts was to encourage acquisition of new business. *Id.* Zishka reported to Spanier that the new commission structure negatively affected older sales representatives and benefited the younger reps. DSOF 26-27 (including response); *see also* PSOF 10-13. Spanier told

---

[4]    Defendants do not directly respond to this statement of fact. There doesn't seem to be any dispute that Zishka was regarded as disabled because of his hand and his impairments from COVID-19. But it is unclear how being "an older male undergoing colorectal cancer screening" would qualify as a disability under the law.

[5]    Zishka originally testified that the commission changes occurred in 2022. *See* Doc. 145-2 at 11-12 (deposition line 86:21-87:23). He later corrected himself and agreed the commission changes occurred in 2020. *See* Doc. 137-6 at 14 (deposition line 148:2-25).

Zishka that WWEX needed to change the commission plan to "realign with the newer reps, the younger reps." PSOF 13. Spanier testified the new plan would impact employees with longer tenure at the company, not necessarily older employees. DSOF 27. Other than this brief conversation between Zishka and Spanier, Zishka never raised concerns about the new commission plan with anyone in management or HR. DSOF 28. Zishka discussed the new plan with other employees, but the only conversation he could recall was with an employee who found the new structure to be beneficial. DSOF 29. That employee was over 40 years old when the new plan went into effect. *Id.*

### D.     Zishka's Performance

In October 2020, Lewis wrote an email to Spanier noting that Zishka ranked last among the Enterprise Sales team in terms of new business for 2019 and 2020. DSOF 39. Additionally, Zishka's significant accounts in 2020 were accounts that he acquired while at LPS, which was later acquired by WWEX. *Id.*

Nevertheless, in July 2021, Zishka achieved President's Club status and his sales performance garnered recognition from WWEX. PSOF 8. On April 20, 2022, Jones invited Zishka and his wife to attend a President's Club ceremony on Marco Island, Florida, in recognition of Zishka's sales performance in 2021. PSOF 9.

In late 2022, WWEX began restructuring to save costs and increase revenue. DSOF 30. This included eliminating positions that were unproductive or unnecessary. *Id.* It also included the initiation of a "Q1 Low Performer Project" in early 2023 intended to identify and terminate low performing sales and operations employees. *Id.* Obinger assisted with tracking and reviewing the terminations. DSOF 31. WWEX also tracked voluntary resignations because those helped with cost savings. *Id.*

By December 16, 2022, Jones had identified Zishka as a "low performer" who might need a "soft exit." PSOF 14. This was so even though eight months earlier Zishka had been recognized for his sales performance. *Id.* Jones contacted Obinger to ask about terminations, noting he had identified Zishka and one other Enterprise Sales team member as low performers who could potentially be terminated. DSOF 32. The identification of low performers was based solely on their ability to acquire new business. DSOF 33. Zishka ranked last among the Enterprise Sales team in terms of new business acquisition in 2022 and 2023. *Id.* Jones reviewed Zishka's performance metrics with Obinger and Spanier before Zishka's termination. *Id.* The Enterprise Sales team was designed to acquire new customers and to upsell/cross-sell existing customers, so Zishka was aware of expectations about new account acquisition. DSOF 34. But Zishka was never written up or placed on a PIP or had any performance issue documented. *Id.* (including response).

Jones contacted Zishka in January 2023 to discuss his performance. DSOF 35. Jones noted Zishka had not acquired any new customers since May 2021, and that Zishka had no documented sales activities. *Id.* Zishka believed he was merely "cherry picking new business." *Id.* (including response); *see also* Doc. 145-2 at 31-32 (deposition line 176:12-13).[6] Zishka believed he had new business developing in the form of "new verticals" and "new services" within existing accounts. DSOF 35 (including response).

Zishka did not dispute that he had not acquired any new customers since May 2021. DSOF 36. But he stated that his performance evaluation should account for the revenue produced by one customer, Deliverr.com. *Id.* That account played a significant factor in Zishka receiving the President's Club award in 2021, which was given each year to employees who achieved success

---

[6]  Zishka's response to DSOF 35 states that Jones was "'cherry picking' a definition of 'new business.'" Zishka's testimony was that Jones was "cherry picking new business." Doc. 145-2 at 31 (deposition line 176:12-13).

in acquiring new customers. *Id.* Jones acknowledged Zishka's point about Deliverr.com and his prior success, but he noted that account had been won in October 2020 and that Zishka had not been performing since that time. DSOF 37. Additionally, the Deliverr.com account had come to WWEX through Hall, Spanier's friend from LPS. DSOF 38. Hall said the account should go to Zishka, who was thankful for the opportunity. *Id.* Hall received commissions on the account, as did Zishka. *Id.* But Zishka was the sales representative who developed and expanded the account and ensured Deliverr.com remained loyal to WWEX. *Id.* (including response).

### E.   Colonoscopy Text Message

On January 26, 2023, Zishka informed Spanier and Jones he had scheduled a colonoscopy. DSOF 24 (including response). Adults aged 50 to 75 are recommended to undergo colorectal cancer screening. PSOF 21. A colonoscopy is the common procedure used for those screenings. *Id.* Zishka texted: "Tomorrow will be out of action getting my 5 year colonoscopy. Hopefully the doctor will send [flower emoji]." PSOF 16. Spanier responded: "Good luck [four leaf clover emoji] Old man [crying laughing emoji] Jk." PSOF 17. Spanier intended it as a humorous message that Zishka would find funny. DSOF 24. Zishka understood "Jk" meant "just kidding," *id.*, but he found the message offensive because it called him an "old man" and he felt Spanier and Jones were ridiculing him for his age, PSOF 18. Jones provided Zishka with advice about the procedure and Zishka responded with a laughing reaction. DSOF 25 (including response). Zishka expected Jones to "make issue" of Spanier's comment. *Id.* But Jones thought Spanier's message was just wishing Zishka good luck and did not think it was derogatory. *Id*. Zishka never reported any concerns about the text exchange to anyone in HR or management. *Id.*

### F.    Termination

On March 7, 2023, Jones Facetimed Zishka and terminated his employment, citing him being the lowest performer of the Enterprise Sales team. DSOF 40; PSOF 19. Zishka was not replaced with another employee. *Id.* Zishka's termination came one month and 12 days after he requested leave for his colonoscopy. PSOF 20. When Jones told Zishka he was being terminated, Zishka did not raise concerns about discrimination. Likewise, Zishka did not raise concerns about discrimination when he talked with HR later that day. DSOF 42. At the time of Zishka's termination, Zishka was 59 years old, Jones was 61 years old, and Spanier was 42 years old. DSOF 41.

Another low performing member of the Enterprise Sales team was also fired on March 7, 2023, in connection with the Q1 Low Performer Project. DSOF 43. That employee (David Potter) was also age-protected. PSOF 40. Before the terminations on March 7, 2023, the average age of the Enterprise Sales team was 47.65. PSOF 39. After the termination of Zishka and Potter, the average age was reduced to 45.71. PSOF 41.

In June 2023, WWEX implemented a reduction in force that resulted in the termination of two additional Enterprise Sales team members, including one who was 37 years old (David Schleyer). DSOF 44 (including response).[7] Schleyer, who was not in an age-protected category and was not disabled, had been identified in the December 2022 email as a low performer who might need a "soft exit." PSOF 28-31. A "soft exit" referred to a severance package. PSOF 32. Despite both Zishka and Schleyer being referenced in the same December 2022 email about low performance, Schleyer was retained until June 28, 2023. PSOF 33. At the time of the March 2023 terminations, Schleyer was outperforming both Zishka and one other team member. *Id.* (including

---

[7]    The other was 56. *See* Doc. 137-12 at 3.

reply). Schleyer received a severance package during the reduction in force. PSOF 34. Zishka did not get a severance. PSOF 36. Jones and Spanier supervised Schleyer, and Jones consulted Spanier about the termination of both Zishka and Schleyer. PSOF 37. After the terminations, Spanier and Obinger celebrated the amount of money saved from not paying commissions to Zishka and other terminated employees. PSOF 23-25.

At the time of Zishka's termination, the Enterprise Sales team had 12 members, including ten men and two women. DSOF 45. Five members (three men and two women) were retained beyond June 2023. *Id.* Four of those five were over the age of 40, including two over the age of 50. *Id.* WWEX also retained the only other disabled member of the Enterprise Sales team. *Id.*

Dennis Sisson was also an age-protected sales representative with high-producing legacy accounts. PSOF 26. WWEX pressured him to retire. *Id.* He accepted a marketing representative role and was not paid all his commissions. *Id.* WWEX also encouraged Sisson to drop his employer-sponsored health insurance and instead sign up for Medicare. PSOF 27. This resulted in an increase in healthcare costs for Sisson. *Id.*

### G.    Claims

Zishka asserts five claims in the Pretrial Order. Count I is a Title VII claim that Defendants terminated Zishka because of his sex. Count II is an ADEA claim that Defendants terminated Zishka based on his age. Count III is an ADA claim that Defendants terminated Zishka because of his disability. Count IV is a retaliation claim in violation of Title VII, the ADEA, and the ADA. And Count V asserts that WWEX breached an implied-in-fact contract by terminating Zishka's employment. Doc. 133 at 10.

## II.    STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III.    ANALYSIS

As noted, Zishka asserts five claims. Count V is for breach of implied contract. Zishka concedes in his response that he signed the employee handbook, which expressly states that nothing in the handbook creates a contractual relationship between Zishka and WWEX. He does not oppose summary judgment in Defendants' favor on that claim. Doc. 145 at 43-44. The remaining claims are: sex discrimination, age discrimination, disability discrimination, and retaliation.

### A.    Direct Evidence

Zishka argues that there is direct evidence of his sex, age, and retaliation claims. He points to Spanier's comments about the impact of the revised commission plan on "younger reps" and the text message that called Zishka an "old man." *See id.* at 30-32.

"Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022).

But it is only direct evidence if it proves a fact in issue without the need of any inference or presumption. *Id.* In employment cases, direct evidence of discrimination is "usually impossible to obtain." *Id.* Even where comments by a decisionmaker reflect animus toward a particular group, those comments alone are not sufficient unless they demonstrate on their face that the decisionmaker acted on that animus. *See id.* at 1213-14; *see also Perry v. Woodward*, 199 F.3d 1126, 1134 (10th Cir. 1999) (requiring a nexus between the discriminatory comments and the decision to terminate).

Zishka first argues there is a direct nexus between Spanier's comments about realigning commissions for "younger reps" to his termination because Spanier "celebrated two days before Mr. Zishka's termination that WWEX/GTZ should calculate Mr. Zishka's commission payments 'as part of the savings' from Mr. Zishka's termination" and that the commissions "are 100% cost savings." Doc. 145 at 31-32 (emphasis in original). Even to the extent that Spanier's comment about younger reps carried a discriminatory animus,[8] and even ignoring that Spanier only approved but did not make the termination decision, the Court struggles to see a nexus to Zishka's termination. To the extent Zishka contends that the commission change more than two years earlier is linked to his termination because WWEX wanted to save on paying those commissions, there is a degree of illogic in that argument. Zishka claims the commission structure was changed to pay older employees less and younger employees more. If the ultimate goal was to save on those commission payments, it's unclear why the terminations would later target the older employees, who according to Zishka, earned less under the changed commission structure.

---

[8]   It's not clear whether Spanier used the term "younger reps" or whether Zishka statement to that effect was just relaying the gist of the conversation. But when deciding a summary-judgment motion, the Court construes the facts in a light most favorable to the non-moving party.

The second evidence Zishka contends is direct evidence is the colonoscopy text where Spanier referred to Zishka as an "old man." The only connection to his termination is that it came one month and 12 days later. But a (somewhat) temporal connection in time does not show that Spanier (to the extent he was a decisionmaker) acted on any sex- or age-related animus. *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 883 (10th Cir. 2018) (finding comment about wanting fewer pregnant employees followed by termination of the plaintiff about a month later was not direct evidence of discrimination); *Heim v. State of Utah*, 8 F.3d 1541, 1546-47 (10th Cir. 1993) (finding that remark by supervisor, "I hate having fucking women in the office," and then shortly thereafter denial of field assignment was not direct evidence of discrimination). "Evidence demonstrating discriminatory animus in the decisional process needs to be distinguished from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process." *Power v. Koss Const. Co.*, 499 F. Supp. 2d 1194, 1201-02 (D. Kan. 2007) (internal quotation and citation omitted). Here, Spanier's comment was a stray remark by someone who did not make the decision to terminate Zishka and was not related to Zishka's termination.

The only way to link Spanier's comment to Zishka's termination is to make an inference (i.e. that Spanier held an age-based animus as demonstrated by the use of the term "old man" and later must have acted on that belief). Evidence that requires an inference is not direct evidence of discrimination or retaliation. *See Ramsey v. City & Cnty. of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990) (noting that "an offer of specific instances of discriminatory statements, from which it was argued that the determining cause of an employment decision might be inferred, was not direct evidence of causation on the employment decision").[9]

---

[9] Zishka cites two district court cases from Maryland to support his claim of direct evidence. The first is factually distinguishable. *See Oladokun v. Grafton Sch., Inc.*, 182 F. Supp. 2d 483, 491 (D. Md. 2002) (involving use of a

In sum, Zishka has not come forward with direct evidence of discrimination or retaliation and must proceed under the *McDonnell Douglas* framework.

## B.       Sex Discrimination – Title VII (Count I)

In the absence of direct evidence of discrimination, the *McDonnell Douglas* framework applies to Zishka's sex-discrimination claim. *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). A plaintiff must first establish a prima facie case of discrimination. *Id.* This includes evidence that "[he] is a member of a protected class, [he] suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." *Id.*

Zishka's sex-discrimination claim seems to be based on the fact that he is a man, Spanier's text message used the phrase "old man," and colorectal cancers are more common in men.[10] *See* Doc. 145 at 34. This borders on frivolous. Zishka is perhaps aware of this because his brief dedicates just a few cursory and conclusory words to his sex-discrimination claim and does not meaningfully try to carry his burden at all.

---

racial slur followed by a statement that the supervisor would "get them out of here," which showed an intent to remove the plaintiff because of his discriminatory attitude). Zishka cites the second for the proposition that whether a nexus exists between and offensive comment and an employment decision turns on the following factors: "the intervening time between the offensive remarks and the employment action; whether the person who uttered the offensive remarks made or recommended the employment action; whether the contents of the offensive remarks related to the employment action; and the frequency of the remarks." *Magassouba v. Prince George's Cnty.*, 773 F. Supp. 3d 196, 213 (D. Md. 2025). But the facts of this case don't show a nexus using this standard. There was almost a month and a half between the text and Zishka's termination. Spanier didn't make the termination decision. The text reference to "old man" did not relate to the termination, and it was only made once in the context of a seemingly friendly text exchange. Further, even if the comments cited by Zishka could convey some evidence of age-related animus, neither indicates a sex-based or retaliatory animus.

[10]  It is not <u>at all</u> clear how men being at higher risk for colorectal cancers gives rise to an inference that Zishka was terminated because of his sex. Regardless, this is not even a fact in evidence. Zishka's cited fact states that colorectal screening is recommended for all adults aged 50 to 75. PSOF 21. And he claims to be disabled based on the fact that he was an older male undergoing colorectal screening. PSOF 35. Neither of these facts state that men have a higher risk of colorectal cancers.

Suffice it to say, Zishka fails to establish a prima facie case of sex discrimination. All the decisionmakers were men. All the comparators were men. Based on the undisputed facts, most of the sales team were men. An isolated reference to Zishka as a "man" in a text message unrelated to and one-and-half months before his termination and a higher incident of colon cancer among men does not give rise to an inference that he was terminated because of his sex. No reasonable jury could conclude otherwise. Defendants are entitled to summary judgment on Count I.[11]

### C.    Age Discrimination – ADEA (Count II)

The ADEA prohibits terminating an employee because of the employee's age. *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080 (10th Cir. 2023). It applies to individuals age 40 and over. *Id.*[12] The same *McDonnell Douglas* standard applies to Zishka's ADEA claim. *See id.* at 1081; *see also Bennett*, 792 F.3d at 1266 (addressing claims under both Title VII and the ADEA). "To establish a prima facie case of age discrimination, the plaintiff must show that (1) he is within the protected age group; (2) he was doing satisfactory work; (3) he was discharged; and (4) his position was filled by a younger person." *Markley*, 59 F.4th at 1081 (citation modified). Where an employee is not replaced, a plaintiff must show that older employees were fired while younger ones were retained. *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1057 (10th Cir. 2020). The remainder of the *McDonnell Douglas* analysis remains the same as in the Title VII context. *See Mauldin v. Driscoll*, 136 F.4th 984, 996-97 (10th Cir. 2025).

---

[11]    Even if Zishka could show a prima facie case of sex discrimination, Defendants have given a legitimate reason for his termination (low performance). None of Zishka's pretext arguments address sex discrimination. *See* Doc. 145 at 40-43.

[12]    It is undisputed Zishka was 59 at the time of his termination. DSOF 41.

### 1.    Prima Facie Case

Defendants argue that Zishka cannot establish a prima facie case of age discrimination and, even if he could make that showing, he has no evidence of pretext. Zishka argues that three factors give rise to an inference of age discrimination. First, a similarly situated 37-year-old employee (Schleyer) was treated more favorably because he was fired three months later and given a severance. Second, Spanier's text included an age-based comment. And third, the average age of the Enterprise Sales team shifted nearly two years younger after the March 7, 2023 terminations.

On the first point, Zishka argues that Schleyer was, like him, identified as a lower performer at the end of 2022. However, Schleyer was allowed to work three more months before he was terminated and was given a severance.[13] But the record reflects that Schleyer was outperforming Zishka and another member of the team (Potter) at the time of the terminations on March 7, 2023. And while Schleyer got a severance when he was fired in June 2023, his termination was from a reduction in force, while Zishka was fired in accordance with the Q1 Low Performer Project, which was intended to identify and terminate low performing sales and operations employees. These are important distinctions in how Zishka and Schleyer were treated that are separate and apart from their age difference.

On the second point, Zishka states that Spanier's "ageist" comment in the text message creates an inference of discrimination. The Court disagrees. It is undisputed that Spanier and Zishka had a friendly relationship. The "old man" comment was made in the context of a joking text conversation that Zishka started. Spanier was also over 40, which is protected under the ADEA. Moreover, Spanier was not the primary decisionmaker. That was Jones, who was <u>older</u>

---

[13]    The Court notes that Zishka's age-discrimination claim is based on his termination, not on the fact that he didn't receive a severance. Doc. 133 at 10. Both Schleyer and Zishka were terminated in a relatively short time frame. Neither party discusses whether an extra three months plus a severance should be considered more favorable treatment under these circumstances.

than Zishka. The text came more than a month before Zishka was terminated, and Zishka had been identified as a low performer subject to termination in December 2022, more than a month before the text message was sent. Although age-related comments may support an inference of age discrimination, there must be some nexus between the statement and the adverse employment action. *Power*, 499 F. Supp. 2d at 1204-05. Here there is no such nexus.[14] Even though the comment was made directly to Zishka, *see id.*, the context in which it was made and the fact that Zishka had already been identified as a low performer undercuts any nexus to his termination. In light of these undisputed facts, no reasonable jury could infer that age discrimination was a factor in Zishka's termination based on Spanier's text.[15]

On the third point, Zishka argues that the two terminations on March 7, 2023, lowered the average age of the Enterprise Sales team by 1.94 years. But such a small change in the average age is not significant. *See Frappied*, 966 F.3d at 1058 (finding disparities in the ages of new and terminated employees in the range of 12 and 29 years gives rise to an inference of discrimination while noting that other circuits "have generally held that an age difference of ten or more years is sufficiently substantial, but an age difference of less than ten years is not"); *see also Douglas v. Int'l Auto. Components Grp. N. Am., Inc.*, 483 F. App'x 178, 181 (6th Cir. 2012) ("There was only a slight decrease in the average age of the employees as a result of the workforce reduction.

---

[14] Zishka again argues that this comment somehow links Spanier's comments in 2020 about the commission changes realigning with the "younger reps" to his termination via his "celebration" about the cost savings associated with the terminations. Doc. 145 at 34-35. As discussed above, the Court struggles to follow this argument and does not find it persuasive.

[15] Zishka cites *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922-23 (8th Cir. 2000), to argue that "remarks like referring to a salesperson as an "old guy" can raise an inference of discrimination. *See* Doc. 145 at 34. In *Fisher*, the comment in question was the company vice president saying "we need to get rid of the old guys," and that his supervisor occasionally referred to the plaintiff as "the old guy." 225 F.3d at 922-23. This is distinguishable from the "old man" remark in Spanier's text, which did not relate to Zishka's employment and was clearly in a joking context. Similarly, Zishka cites *Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993), where the age-related comments were that the plaintiff was too old for a certain position and that her upcoming 55th birthday was a cause for concern. These comments are distinguishable from Spanier's. *Phelps* specifically noted that "isolated and ambiguous comments" do not point to age discrimination. 986 F.2d at 1025-26.

Accordingly, the statistics do not create an inference that IAC targeted employees based on their age."); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 116 (S.D.N.Y. 2009) ("Similarly, the fact that the average age of the fourteen nursing assistants in Kolesnikow's unit in November 2004 was 38, and that the average age had dropped to 37 by July 2006, is not probative of a bias against older employees."). Although the average age may have gone down slightly after two members of the team were fired in March 2023, it is undisputed that of the five Enterprise Sales team employees who were retained after June 2023, four were over 40, including two over 50. DSOF 45. This does not show that older, age-protected members of the team were terminated while younger employees who are not age protected were retained. Zishka acknowledges that the Tenth Circuit has recognized that a two-year difference in age between a terminated employee and his replacement is "an obviously insignificant difference." *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000). However, he argues that a shift in <u>average</u> age by that amount "reflects that the terminations affected the oldest members of the group." Doc. 145 at 36. But the evidence in the record shows that the two individuals terminated on March 7, 2023, were not even the two oldest members of the sales team. *See* Doc. 137-12 at 3. Such a small variation in the average age of the team after Zishka's termination does not give rise to an inference of age discrimination.

In sum, the three facts Zishka identifies do not create an inference of discrimination. This is sufficient to grant summary judgment in Defendants' favor on the age-discrimination claim. But even if Zishka's arguments did establish a prima facie case, Defendants have given a legitimate reason for Zishka's termination—his low sales performance on new accounts. That shifts the burden back to Zishka to come forward with evidence that the stated reason is a pretext for age discrimination.

###### 2.    Pretext

If a plaintiff meets his initial burden of making a prima facie case, and the defendant can "articulate a legitimate, nondiscriminatory reason for its actions," the burden shifts back to the plaintiff to show that the explanation is pretext. *Bennett*, 792 F.3d at 1266. "The plaintiff may establish pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 1267 (internal quotation and citation omitted). In determining pretext, courts consider the facts from the decisionmaker's point of view. *Jiang v. City of Tulsa*, 169 F.4th 1194, 1200 (10th Cir. 2026). Whether the underlying decision was wise, fair, or correct does not enter the analysis. *Id.*

Zishka argues four facts to demonstrate that WWEX's reason for terminating him is pretext. First, a younger, non-disabled employee (Schleyer) received more favorable treatment. Second, WWEX targeted other older workers (Sisson). Third, the termination of Zishka and Potter reduced the average age of the Enterprise Sales team by 1.94 years. Fourth, Spanier made ageist comments and touted the savings of Zishka's commission after his termination.

Three of Zishka's pretext arguments have been addressed already. For the same reason they don't give rise to an inference of discrimination, the Court finds they do not demonstrate pretext. The only new argument is about Sisson. Zishka argues that Sisson was a member of the Enterprise Sales team and was supervised by Spanier, but Sisson was forced to retire. As an initial matter, there is nothing in the record suggesting that Sisson was on the Enterprise Sales team or was supervised by Spanier. Zishka's statement of facts don't state as much, nor does Sisson's

underlying declaration. *See* PSOF 26-27; *see also* Doc. 145-7.[16] But even if it did, the facts in the record are that: Defendants employed Sisson as a sales representative from 2017 to 2021, Defendants forced him to retire and become a marketing representative, and Defendants also encouraged him to sign up for Medicare when he became eligible. Suffice it to say, this does not call into question the proffered reason for Zishka's termination in 2023, especially where it is undisputed he was the lowest performer of the Enterprise Sales team. *See Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 856 (10th Cir. 2000) (stating that anecdotal evidence of other discriminatory acts should only be admitted if it can be tied to the adverse action at issue or involved the same supervisors and was not "several years before the contested action or anytime after"). No reasonable jury could conclude otherwise.

The Court grants Defendants summary judgment on Count II.

### D.      Disability Discrimination – ADA (Count III)[17]

To sustain a disability-discrimination claim under the ADA based on disparate treatment, it is not sufficient that an individual with a disability suffered an adverse employment action. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017). Rather, the adverse action must have been taken "on the basis of" the disability. *Id.* As with the other discrimination claims, a plaintiff may show such discriminatory intent using the *McDonnell Douglas* framework. *Edmonds-Radford v. Sw. Airlines Co.*, 17 F.4th 975, 989 (10th Cir. 2021). Thus, Zishka must first establish a prima facie case: (1) he is disabled,[18] (2) he was qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) he suffered an adverse employment action

---

[16]   Even if Sisson was supervised by Spanier, it is undisputed that Jones made the decision to fire Zishka.

[17]   The governing law is now the ADA Amendments Act of 2008 ("ADAAA"). The Court applies the amended law and regulations. But the Court continues to use the term "ADA" for ease of reference.

[18]   It is undisputed that Zishka is disabled. PSOF 35.

because of his disability. *See id*. at 989-90. The burden then shifts to Defendants to articulate nondiscriminatory reasons for its actions. *See id*. at 990. Zishka then bears the burden of showing the proffered reason was pretext for discrimination. *See id.*

Like his sex-discrimination claim, Zishka does not make a vigorous argument about disability discrimination. He argues that he can make a prima facie showing of discrimination because Schleyer was not disabled and was treated "more favorably." As discussed above, however, Schleyer was not terminated with Zishka because he was not one of the lowest two performers at the time. Although he was fired three months later and received a severance, his termination was part of the reduction in force, not the Q1 Low Performer Project. Defendants also note that the only other member of the Enterprise Sales team who was disabled was not terminated. *See* Doc. 137-12 at 3. By simply relying on Schleyer's termination, Zishka has not come forward with evidence that a reasonable fact finder could conclude he was terminated because of his disability. Defendants are entitled to summary judgment on Count III.

### E.    Retaliation – Title VII, ADEA, ADA (Count IV)

Zishka asserts one retaliation claim, but he claims retaliation under Title VII, the ADEA, and the ADA. *See* Doc. 133 at 10. The *McDonnell Douglas* framework applies to each of these retaliation claims. To state a prima facie case of retaliation, a plaintiff must show (1) he engaged in protected opposition to discrimination, (2) a reasonable employee would find the challenged action materially adverse, and (3) a causal connection exists between the two. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013) (Title VII retaliation claim); *Mauldin*, 136 F.4th at 995 (ADEA retaliation claim); *Edmonds-Radford*, 17 F.4th at 994 (ADA retaliation claim).

Defendants argue that Zishka cannot meet his burden to show a prima facie case of retaliation because he has not engaged in any protected activity under Title VII or the ADA, and

there is no causal connection between his termination and his comment three years earlier about the impact of the changed commission structure on older employees.

### 1.    Title VII Retaliation

Zishka offers no facts showing that he ever engaged in protected opposition to sex discrimination. *See Battino v. Redi-Carpet Sales of Utah, LLC*, 2021 WL 4144974, at *5 (10th Cir. 2021) (explaining that a retaliation claim under Title VII requires a showing of opposition to a practice made unlawful by Title VII); *see also* 42 U.S.C. § 2000e-3(a) (prohibiting retaliation "because [an employee] has opposed any practice made an unlawful employment practice by this subchapter"). His brief only discusses protected activity under the ADEA and the ADA. Doc. 145 at 38-39. There are no facts in the record at all that Zishka ever engaged in protected activity under Title VII or raised any concerns about sex discrimination. He has therefore failed to make a prima facie case of Title VII retaliation, and the Court grants Defendants summary judgment on that claim.

### 2.    ADEA Retaliation

Zishka argues that he can establish a prima facie case of retaliation under the ADEA because he complained that the changed commission structure targeted older workers. *Id.* at 38. But even assuming this qualifies as protected activity under the ADEA, Zishka has not made a causal connection between this activity, which took place in 2020, and his termination in 2023. Zishka's response does not even meaningfully argue a causal connection. *See id*. To the extent Zishka tries to link the commission changes to Zishka's termination based on Spanier's comments about cost savings, *id.* at 39, those arguments are not persuasive for the reasons noted above. The Court therefore finds Zishka has failed to make a prima facie showing of ADEA retaliation and the Court grants Defendants summary judgment on that claim.

### 3.    ADA Retaliation

Zishka argues he engaged in protected activity under the ADA "when he requested the reasonable accommodation of time off to undergo a '5 year colonoscopy.'" *Id.* at 38. The causal connection Zishka relies on is temporal proximity to his termination (one month and 12 days). *Id.* at 39. Defendants argue that Zishka's request for time off for his colonoscopy was unrelated to any of Zishka's disabilities, and they argue that the request was not a sufficiently clear request for an accommodation. Doc. 137 at 26-27.

A request for a reasonable accommodation is protected activity under the ADA. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016) ("Similarly, this court and others recognize that a request for accommodation can constitute protected activity supporting a retaliation claim."). But Zishka was not asking for a reasonable accommodation for a disability. He was requesting time off for a colonoscopy appointment. The colonoscopy was not related to any disability, nor is a colonoscopy itself a disability. *See Brtalik v. S. Huntington Union Free Sch. Dist.*, 2012 WL 748748, at *4 (E.D.N.Y. 2012) ("Brtalik's attempt to characterize a routine, diagnostic, out-patient procedure, or any related minor discomfort, as a disability within the meaning of the ADA is simply absurd."); *Pittman v. Am. Airlines, Inc.*, 2016 WL 3129228, at *10 (N.D. Okla. 2016) ("[A] colonoscopy does not qualify as a disability for a number of reasons, including that the ADA does not encompass temporary impairments."). It was a medical appointment for screening purposes. While requests for time off for medical appointments connected to a disability might be protected activity in certain circumstances, requests for time off for medical appointments generally are not. None of the cases Zishka cites suggest otherwise.

Moreover, for purposes of a retaliation claim, the requested accommodation must be direct and specific and put the employer on notice that the employee seeks an accommodation. *Foster*,

830 F.3d at 1188 (noting that no magic words are required but "it nonetheless must make clear that the employee wants assistance for his or her disability"). Here, the entirety of Zishka's "request" was "Tomorrow will be out of action getting my 5 year colonoscopy. Hopefully the doctor will send [flower emoji]." PSOF 16. No reasonable factfinder could conclude this was a request for a disability accommodation.

Even if Zishka's request for time off for his colonoscopy was protected activity under the ADA, the only causation evidence he points to is that the request occurred one month and 12 days before his termination. But this again ignores that Zishka had already been identified as a low performer who was a candidate for termination a month before he requested time off for his colonoscopy.

In sum, Zishka has failed to establish a prima facie case of retaliation under the ADA. Defendants are entitled to summary judgment on his retaliation claim in Count IV.

### F.    Provisionally Sealed Documents

Plaintiff filed five exhibits provisionally under seal. Docs. 146-150. The exhibits in question were designated confidential by Defendants. *See* Doc. 151. Defendants have not filed a motion to continue those documents under seal as required by D. Kan. Rule 5.4.2(c), to the extent they wish to keep them sealed.[19] Because no party seeks to maintain those documents under seal, the Court directs the Clerk to remove the provisional sealing designation for Docs. 146-150.

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that Defendants' Motion for Summary Judgment (Doc. 136) is GRANTED. The Clerk shall enter judgment in favor of Defendants.

IT IS SO ORDERED.

---

[19]    It appears that some of these documents have already been publicly filed by Defendants.

Dated: May 28, 2026                    /s/ Holly L. Teeter
                                       HOLLY L. TEETER
                                       UNITED STATES DISTRICT JUDGE